**Peter LURIE, et al., Plaintiffs,**

v.

**DEPARTMENT OF THE ARMY, Defendant.**

**Civil Action No. 95–1085(JHG).**

United States District Court, District of Columbia.

July 15, 1997.

---

24

Eric Robert Glitzenstein, Meyer & Glitzenstein, Washington, DC, for plaintiffs.

Lisa Sheri Goldfluss, U.S. Attorney's Office, Robert Lawrence Shapiro, Spriggs & Hollingsworth, Washington, DC, for defendant.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Presently pending is the defendant's Motion for Summary Judgment. Upon consideration of this motion, the plaintiffs' opposition, the defendant's reply, the plaintiffs' Notice of Recent authorities and the defendant's response thereto, and after reviewing the withheld documents which were submitted for *in camera* review pursuant to this Court's Orders of September 27 and November 12, 1996, the motion will be denied in part and granted in part. Disclosure will be ordered as set out in this opinion.

### I. Background

This FOIA suit stems from research that the Department of the Army conducted into a potential vaccine for the HIV virus, which causes AIDS. In 1991 and early 1992, researchers at the Walter Reed Army Institute of Research ("WRAIR"), led by Lieutenant Colonel ("Lt.Col.") Robert Redfield, M.D., Chief of the Department of Retroviral Research, reported to Congress and published in well-known medical publications that, based on certain clinical trials, a vaccine known as gp160 appeared to have salutary effects on persons infected with HIV. *See Ten Years of AIDS: Hearing before the Subcomm. on Health and the Environment, Comm. on Energy and Commerce* ("*Ten Years of AIDS Hearing*"), 102d Cong., 1st Sess. 96 (June 6, 1991) (testimony of Lt.Col. Redfield) ("the individuals that have been immunized appear not to have a fall in their CD4 cells as opposed to historical controls"); *AIDS Research Opportunities: Hearing before the Subcomm. on Health and the Environment of the Comm. on Energy and Commerce* ("*AIDS Research Opportunities Hearing*"), 102d Cong., 2d Sess. 95 (testimony of Lt.Col. Redfield) ("I am part of the research team that may, in fact, provide a treatment for all people with early HIV infection."); Robert R. Redfield, *et al.*, *A Phase I Evaluation of the Safety and Im-*

*munogenicity of Vaccination with Recombinant gp160 in Patients with Early Human Immunodeficiency Virus Infection,* New England J. of Med. (June 13, 1991), *reprinted in AIDS Research Opportunities Hearing, supra,* at 83–90; *see also AIDS Research Opportunities Hearing, supra,* at 81 (Feb. 24, 1992) (testimony of Colonel ("Col.") Donald Burke, M.D., Director, Division of Retrovirology, WRAIR) ("we showed unequivocally that vaccine therapy with gp160 was safe and that it did indeed boost the natural levels of antibodies and cellular immunity").

Dr. Redfield described the imitative at the Defense Department's Walter Reed Army Medical Center:

Well, the long-term goals of the Defense Department have been trying to develop a vaccine for treatment and prevention, and for a great—actually, about a century ago the concept of using vaccines as therapeutic was actually originated.

What we attempted to do at Walter Reed over the last several years was to see if you could modify the immune response of patients that are chronically infected to boost it so maybe they can control it better by actually using an AIDS vaccine to treat. And next week, there is also that original Phase I feasibility trial that will be published, and, in fact, it is feasible. You can actually use a vaccine in an individual with a chronic infection and change the entire immune response and defense that they have against that virus, and it is safe. At present, it is intriguing because the individuals that have been immunized appear not to have a fall in their CD4 cells as opposed to historical controls.

*Ten Years of Aids Hearing, supra,* at 96.

Lt.Col. Redfield's prediction of a potential breakthrough in the war on AIDS aroused extraordinary interest in Congress, in the news media and in the medical community. *See, e.g., AIDS Conference to Unleash Research Covering Vaccines and Gene Therapy,* Wall St. J., at B4 (July 15, 1992) ("Dr. Redfield has been testing vaccines as a type of immune therapy in people who are infected with the AIDS virus. This spring he forecast that his data will show the treat-

ments lower virus levels and stabilize infection-fighting immune cells."); *Multiple Mutating HIV Strains Stymie Researchers Seeking a Vaccine for AIDS*, Wall St. J., at B6 (May 26, 1992) ("Robert Redfield, a researcher at Walter Reed Army Medical Center in Washington will soon have 600 volunteers enrolled in his studies of AIDS vaccines as immune-boosters. He is testing such vaccines not for purposes of prevention but as treatment for people who are already HIV-infected."); Bernie Ankey, *U.S. Medicine Interviews* Robert R. Redfield, *U.S. Medicine*, at 8 (April 1992) (Dr. Redfield: "I personally believe it holds the key to converting HIV infection to a prolonged, subclinical disease within my lifetime."); 137 Cong.Rec. S17663 (Nov. 22, 1991) (statement of Sen. Dodd) ("Last summer, the distinguished New England Journal of Medicine published the first results of a study conducted by Dr. Robert Redfield of Walter Reed .... [These interim test results] give us some reason for hope that we can develop a way to effectively help HIV infected people maintain their immune system function and stay healthy or at least stay healthy for a longer period of time.").

In July 1992, Lt. Col. Redfield made a presentation to the Eighth International AIDS Conference in Amsterdam which was widely interpreted as a bold assertion that there had been statistically significant decreases in the amount of HIV in the blood of those patients who received the gp 160 vaccine as opposed to those in a control group. As were his previous public statements, Redfield's Amsterdam presentation was widely covered by the media. *See, e.g., At AIDS Talks, Hope is Weighed Down by the Hard Reality*, N.Y. Times, at 1, 15 (July 26, 1992) ("Dr. Robert R. Redfield, of Walter Reed Army Medical Center in Washington, said patients receiving the vaccine had lower amounts of H.I.V. and a reduced rate of decline of one of the monitoring tests of the immune system."); Richard A. Knox, *New Problems, New Hopes at AIDS Parley*, Bost. Globe (July 26, 1992) (" 'There is no doubt in my mind that next year we will be on first base in terms of showing that human HIV infection can ultimately be a self-limited disease that never proceeds to immune system collapse,' Dr. Robert Redfield of the Walter

Reed Army Institute for Research in Maryland said in an interview. 'I think AZT was a bunt down the foul line.' "); 257 *Science*, at 605 (July 31, 1992) ("Robert Redfield of the Walter Reed Army Institute of Research claimed that he's reduced the amount of HIV in the blood cells of infected people who have been treated for two years with a vaccine made from the HIV surface protein gp160."). In the same article, the Boston Globe reported on the Army's program and the pressure for its expansion:

The U.S. Army is spending $15 million on a trial in progress of GP–160 compared with a dummy vaccine in 600 H.I.V.-infected patients. Studies so far, which indicate GP–160 is apparently harmless are generating pressure by AIDS activists and doctors to let the experimental vaccine be tried in a bigger group, perhaps 2,000 HIV-infected volunteers while waiting for definitive evidence.

"Can we let the next three years go by without some kind of wider acceptance to GP–160?" said Dr. Calvin Cohen of Boston, research director of the Community Research Initiative of New England. "Clinical researchers like me need to meet with the Food and Drug Administration and try to make it happen."

Knox, *New Problems, New Hopes at AIDS Parley, supra.*

On September 18, 1992, Senator Sam Nunn introduced Amendment No. 3094 to the bill that became the 1993 National Defense Authorization Act. This amendment provided $20 million for further testing of gp160:

Mr. President, I offer this amendment that would add $20 million for AIDS and research at the Department of Defense medical research facilities.

This amendment would provide for the third phase of testing for a new vaccine which has shown great promise as a way of delaying the onset of the deadly implications of the AIDS virus. This advantage is now seen in stage 2 testing in Walter Reed Medical Center. According to Army medical experts, phase 2 has shown that the

vaccine should go to phase 3 as soon as possible.

This research and other fine medical work at Walter Reed are excellent examples of our military research facilities which can and are helping to solve the problems that are important and crucial to civilian society.

Mr. President, I urge adoption of the amendment on behalf of myself and Senator Warner, and I also say former Senator Russell Long has brought this matter to our attention.

\* \* \*

Mr. President, in the case of this kind of research, time literally means saving the lives of people now sick with this deadly disease. The sooner we get these tests completed, the better off so many people in our Nation will be.

138 Cong.Rec. S14156, S14159–60 (Sept. 18, 1992), *reprinted at* 1992 WL 229956 (Cong. Rec.).

The $20 million rider to the Defense authorization act set off a firestorm of debate in the scientific research community because it circumvented the normal process for federal funding of scientific and medical research. *See* Jon Cohen, *Did Political Clout Win Vaccine Trial for MicroGeneSys?*, 258 *Science*, at 211 (Oct. 9, 1992). Bernadine Healy, the director of the National Institutes of Health (NIH), commented that it was unprecedented for Congress to direct research to a specific experiment. *Id.* And, as it had before, this development in the testing of gp160 received significant press coverage. *See, e.g., Lobbyists and Drug Tests*, The Wash. Post, Oct. 28, 1992, at A24, *reprinted at* 1992 WL 2159626; *Lawmakers' Approval of $20 Million for Aids Vaccine Tests Draws Protest*, The Courier–Journal, Oct. 26, 1992, *reprinted at* 1992 WL 7863278 ("several scientists said it was extremely rare for lawmakers to appropriate money for testing a specific treatment"); *Scientists Protest AIDS Vaccine Trials*, Houston Chron. (Oct. 26, 1992), *reprinted at* 1992 WL 11453801 ("The federal government's top scientists are angrily protesting a recent decision by Congress to bypass medical researchers and approve $20

million for human trials of an experimental AIDS vaccine."); *AIDS Vaccine Decision Disputed Government Scientists Say Congress Was Out of Line*, The Kansas City Star, Oct. 26, 1992, *reprinted at* 1992 WL 6474184 (same); *AIDS Research Bill Angers Scientists Critics Say Congress Went Too Far When Approving Trials on Humans For Vaccine*, L.A. Daily News, Oct. 26, 1992, *reprinted at* 1992 WL 8197562 (same); *Approval of AIDS Drug Trial Protested: Researchers Claim They Were Bypassed*, The Raleigh News & Observer, Oct. 26, 1992, *reprinted at* 1992 WL 80334415 (same); *Federal Scientists Fuming Over $20 Million AIDS Appropriation*, The Sacramento Bee, Oct. 26, 1992, *reprinted at* 1992 WL 9779290 (same); *$20 Million for AIDS Creates Furor*, The S.F. Chron., Oct. 26, 1992, *reprinted at* 1992 WL 6286748 (same); *Congressional AIDS Measures Worry Public Health Advocates*, Med. & Health, Oct. 26, 1992, *reprinted at* 1992 WL 2790128 (discussing "earmark[ of] $20 million of the defense budget for Phase III clinical trials of experimental AIDS vaccine gp160"); Jon Cohen, *Lobbying for an AIDS Trial*, 258 *Science*, at 536 (Oct. 23, 1992) (same); *AIDS Drug Trial is Result of Lobbying, NIH Charges*, Wall St. J., Oct. 20, 1992, at B5, *reprinted at* 1992 WL–WSJ 631178 (same); *Old-fashioned Lobbying Wins Funding For Human Tests of New AIDS Drug*, The Baltimore Evening Sun, Oct. 20, 1992, at A14, *reprinted at* 1992 WL 9543586 (same); *Lobbyist Wins Trial for AIDS Drug*, Chicago Sun–Times, Oct. 20, 1992, at 29, *reprinted at* 1992 WL 3491765 (same); *AIDS Vaccine Goes Political*, The Cleveland Plain Dealer, Oct. 20, 1992, at 4A (same); *Lobbyist Gets Congress to Fund Research for Rebuffed AIDS Vaccine*, Portland Oregonian, Oct. 20, 1992, at A12, *reprinted at* 1992 WL 7357733 (same); *Lobbying in Senate Gets AIDS Drug Rushed to Testing*, The Seattle Times, at A2, *reprinted at* 1992 WL 5052966 (same); *Ex–Senator's Lobbying for AIDS Drug Assailed*, St. Louis Post–Dispatch, Oct. 20, 1992, at 9A, *reprinted at* 1992 WL 3561935.

At approximately the same time that Congress awarded millions of dollars in taxpayer funds for testing the gp160 vaccine at Walter

Reed, allegations surfaced that Lt.Col. Redfield had distorted the results of his research. In mid-October 1992, a memo from the previous August, which had criticized Redfield's methodology and his conclusions, was obtained by the press. *See* Statement of William F. McCarthy (Dec. 7, 1992), attachment 3 to Plaintiffs' Ex. G; Phyllida Brown, *Memo Suggests U.S. Army HIV Vaccine Oversold, New Scientist,* at 8 (October 24, 1992) ("Claims for a vaccine therapy that the U.S. Army is testing in HIV-positive patients may have been exaggerated, according to data in an internal memo obtained by *New Scientist*."). Thus, the debate about the gp160 testing, which had been raging within the military medical research community for several months, became public. *Id.*

Dr. McCarthy's criticism was not the only challenge to Lt.Col. Redfield's conclusions and methodology. In a memorandum to Col. Burke (Redfield's supervisor), Major ("Maj.") Craig W. Hendrix, M.D., the Director of the HIV Program in the Air Force and Col. R. Neal Boswell, M.D., the Associate Chief of the Division of Medicine in the Air Force complained about "[t]he problem of misleading or, possibly, deceptive presentations by Dr. Redfield, which overstate the GP160 phase I data." Memorandum of Oct. 21, 1992, at ¶ 1, attachment 2 to Plaintiffs' Ex. G. This memorandum indicates that Redfield's presentations had been subjected to severe and substantial criticism within the military medical research community since at least late July 1992 when Dr. Maryanne Vahey "first questioned Dr. Redfield's Amsterdam talk." *Id.* ¶ 1. Maj. Hendrix and Col. Boswell described the Amsterdam presentation as "[t]he most serious example of potential scientific misconduct." *Id.*

Noting that the scientific credibility of the military medical research was at risk, the two senior military doctors who authored the memorandum described their concerns in no uncertain terms:

> Last week, at the 32nd Annual ICAAC meeting in Anaheim, CA, Dr. Redfield again presented data in an incomplete and misleading fashion, despite assurances to the MMCARR[1] in several recent meetings that he understood his past presentations to be in error and that he would refrain from repeating that error. If these actions are an intentional deception, it is an error of the most serious kind in science that betrays the trust of colleagues, patients and sponsors.

*Id.*

In their memorandum, the authors set forth in detail their evidence of "potential scientific misconduct." That evidence included:

> Overselling the GP160 phase I data may date back as early as the New England Journal of Medicine publication (N Engl J Med 1991: 324:1677–84). Oral presentations of the phase I continuation data over the last year and a half have repeatedly shown only a few selected "home run" patients. The data from the entire study group has not been well represented by these selected patients. Data analysis has been either sloppy or, possibly, deceptive with use of inappropriately chosen "control" groups, unorthodox statistical methods that abuse the data to come up with the desired CD4 trend conclusions, failure to include appropriately performed analyses that fail to support the desired conclusion and badgering of statisticians and colleagues by Dr. Redfield, sometimes successfully, to agree to data analyses against their better professional judgment.

*Id.* ¶ 3.

Dr. Redfield's professional peers sought specific action from Col. Burke:

> Accordingly, we insist that further action be taken immediately to: (1) publicly correct the record in a medium suitable for widespread dissemination to our civilian scientific colleagues, (2) censure Dr. Redfield for potential scientific misconduct which should at least include temporarily suspending his involvement on the current immunotherapy protocols, and (3) initiate

---

1. Although the precise meaning of this acronym was not identified in the parties' papers, given the context, it appears that "MMCARR" is a committee representing the military medical research community.

an investigation by a fully independent outside investigative body, such as the Office of Scientific Integrity of the N.I.H. to evaluate the facts of the case and recommend appropriate actions. *Id.* ¶ 4.

They also raised their "serious concern" regarding Lt. Col. Redfield's connection to a non-profit organization called "Americans for a Sound AIDS Policy" or "ASAP," which had lobbied Members of Congress for gp160 funding at the same time that Redfield was a member of ASAP's Advisory Board. The memorandum's authors alleged that ASAP's President, Shepherd Smith, had attempted to influence Dr. Vahey, the doctor who had assisted Redfield in analyzing the "viral load" of the patients receiving the vaccine and who later criticized his Amsterdam presentation:

Smith also contacted Dr. Vahey prior to her 31 AUG 92 presentation of the GP160 phase I data which was to be the first public presentation of the data in a nonselective, appropriately analyzed fashion. According to Dr. Vahey, Mr. Smith had intimate knowledge of the GP160 phase I data and offered detailed suggestions for how Dr. Vahey should present the incomplete data with the control groups, coincidentally as Dr. Redfield had done in Amsterdam, to favor further development of the vaccine. He also insisted that she needed to know of the increasing pressures on her due to: (1) the millions of dollars at stake, (2) Army–NIH vaccine competition, and (3) upcoming congressional testimony on GP160 vaccine studies. We are suspicious of Mr. Smith's access to GP160 data, his involvement at the most basic level of data analysis on this study, and his motivations in raising issues of financial and congressional pressure which are scientifically immaterial and have, on the surface, the appearance of a very gross impropriety.

*Id.* ¶ 5.

Two days after Col. Boswell and Maj. Hendrix submitted their memorandum to Col. Burke, the "Institute Review Committee's Subcommittee on Potential Scientific Misconduct in GP160 Phase I Immunotherapy Study" convened to consider the subject matter of that memorandum. *See* Meeting Minutes, attachment 1 to Plaintiff's Ex. G. The subcommittee "agreed that the information presented by Dr. Redfield seriously threaten[ed] his credibility as a researcher and ha[d] the potential to negatively impact AIDS research funding as a whole. His allegedly unethical behavior create[d] false hope and could result in premature deployment of the vaccine." *Id.* at 2.

On October 22, 1992, the Army convened an informal investigation pursuant to Army Regulation ("AR") 15–6 ("AR 15–6 informal investigation"). *See* Memorandum for Colonel Harry G. Dangerfield, U.S. Army Medical Research and Development Command, attached as Plaintiffs' Opp. at Ex. N. Major General ("MG") Richard T. Travis, commander of the U.S. Army Medical Research and Development Command, appointed Col. Dangerfield to "investigate the facts and circumstances surrounding alleged scientific misconduct associated with the Army HIV Program" and charged him with "determin[ing] whether any Command personnel acted in violation of Federal law or Army regulation." *Id.;* Declaration of Charles H. Bowers, FOIA Officer, Office of the Surgeon General, Department of the Army ("Bowers Decl.") ¶ 6. The AR 15–6 informal investigation generated widespread media coverage. *See, e.g., U.S. Investigates AIDS Researcher,* N.Y. Times, Nov. 5, 1992, at A28; *Officials Investigate Researcher in Connection With AIDS Vaccine,* Portland Oregonian, Nov. 5, 1992, at B4 Jon Cohen, *Army Investigates Researcher's Report of Clinical Trial Data,* 258 *Science,* at 1568 (Dec. 4, 1992), *reprinted at* 1992 WL 11304481; Susan Katz Miller, *Is Congress Backing the Wrong AIDS Vaccine?, New Scientist,* at 11 (Nov. 14, 1992); CBS, *Transcript from the CBS Evening News* at 4–5 (Nov. 11, 1992), attached to Plaintiff's Opp. at Ex. P.

On February 22, 1993, Col. Dangerfield completed his AR 15–6 informal investigation, concluding that the "evidence does not support the allegations of scientific misconduct." Memorandum for Major General Richard T. Travis, Commander, U.S. Army Medical Research and Development Command ("Dangerfield Report"), at section iv (Findings), ¶ 1. In section v of his report,

Col. Dangerfield recommended that no adverse actions be taken and that "[i]n fairness to Lt.Col. Redfield, the HIV Research Program, the Army and scientific community, a press release correcting the record is warranted." *Id.* at section v (Recommendations), ¶ 2.

MG Travis reviewed Col. Dangerfield's investigation, neither approving it nor disapproving it. *See id.* at section viii (Action by Appointing Authority), ¶ 1; Bowers Decl. ¶ 8. Finding it to be incomplete, see Dangerfield Report at section viii, ¶ 2, MG Travis appointed Col. Garland McCarty to "continue an informal investigation [into] the facts and circumstances surrounding the participation of personnel in the Retrovirology Division at Walter Reed Army Institute of Research in an organization known as 'Americans for a Sound AIDS Policy.'" Memorandum for Colonel Garland E. McCarty, U.S. Army Medical Department Center and School, at ¶ 1 (Mar. 9, 1993), attached to Plaintiffs' Opp. at Ex. T.

On April 6, 1993, Col. McCarty completed his investigation, including therewith all of Col. Dangerfield's investigation and exhibits. *See* Bowers Decl. ¶ 9. Col. McCarty made specific findings and recommendations, all of which MG Travis approved. *Id.*; Report of Proceedings by Investigating Officer, DA Form 1574 ("McCarty Report"), at section viii (Action by Appointing Authority), attached to Plaintiffs' Opp. at Ex. T. In his findings, McCarty concluded that ASAP had probably received scientific information that was not widely disseminated. *See* McCarty Report at section iv (Findings), ¶ 7. In one of the two recommendations publicly disseminated, he recommended that relationship between Walter Reed and ASAP be terminated. *See id* at section v (Recommendations), ¶ 4.[2]

Like Redfield's presentations of the gp160 data, the debate within the military medical research community and the allegations of scientific fraud, the results of the Army's inquiry, including criticism of it, was reported by the media. *See, e.g.,* Jon Cohen, *Army*

*Clears Redfield—but Fails to Resolve Controversy,* 261 *Science,* at 924 (Aug. 13, 1993), *reprinted at* 1993 WL 12231028; Phyllida Brown, *Anger Over 'Selective Data' on HIV Therapy, New Scientist,* at 4 (July 17, 1993); *AIDS Vaccine Cover-up Alleged,* MarketLetter (Aug. 9, 1993), *reprinted at* 1993 WL 2827289.

On July 5, 1994, Plaintiffs Peter Lurie, M.D., and the Public Citizen Health Research Group requested the disclosure of records under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (1994), regarding the McCarty and Dangerfield informal investigations. *See* Compl. ¶ 6. Their FOIA request specifically described the records they sought:

> The full unredacted versions (with all attachments) of the reports of Colonel Henry (sic) Dangerfield on the GP160 AIDS vaccine trial and Colonel Garland McCarty on the relationship between the Armed Forces researchers and Americans for a Sound AIDS Policy (ASAP).

Public Citizen letter of July 5,1994, attached to Plaintiff's Opp. at Ex. Y

On September 14, 1994, the Army released some of the records that the plaintiffs requested, but withheld others (or portions of others) based on an assertion of FOIA Exemptions 5 (deliberative process), 6 (personal privacy) and 7(C) (law enforcement records). *See* MG Thomas R. Tempel, Acting Deputy Surgeon General, letter of Sept. 14, 1991, attached to Plaintiffs' Opp. at Ex. AA; Bowers Decl. ¶¶ 3 & 12–14, attached to Defendant's Motion for Summary Judgment at Ex. 1; Compl. ¶ 7. In particular, the Army withheld portions of McCarty's findings and recommendations, while releasing all of Dangerfield's. Other records, such as witness statements submitted by Dr. Hendrix, Dr. Boswell and Dr. McCarthy were heavily redacted. On the other hand, the majority of Dr. Redfield's statement was released.

On November 1, 1994, the plaintiffs appealed, *see* Plaintiffs' Ex. BB; Compl. ¶ 8, which the Army denied on April 17, 1995.

---

**2.** In the other recommendation that has been disclosed, he recommended that report be approved as submitted.

*See* Bowers Decl. ¶ 5; Compl. ¶ 10. Thereafter, the plaintiffs filed suit in this Court in this Court pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331. They now seek:

(1) a declaration that the Army's refusal to disclose the records was unlawful;

(2) a court order directing the defendant to disclose the requested records;

(3) an award of costs and reasonably attorneys' fees; and

(4) such other relief as this Court may deem just and proper.

Compl. at 3–4.

The defendant later moved for summary judgment, submitting an index under *Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir. 1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873. However, because the *Vaughn* index and the Bowers Declaration were insufficiently detailed and too conclusory in nature to afford an adequate review of the claimed exemptions, the Court directed the Army to submit the withheld documents, in unredacted form, for *in camera* review. *See* Order of Sept. 27, 1996; Order of Nov. 12, 1996. The Court has now reviewed each document in light of the exemptions claimed by the Army and rules as described below.

## II. Discussion

### A. *The Freedom of Information Act.*

 FOIA's core purpose is to shed light on the operation of government. *Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 773, 109 S.Ct. 1468, 1481–82, 103 L.Ed.2d 774 (1989). This purpose is effectuated by "facilitat[ing] public access to Government documents," *Department of State v. Ray*, 502 U.S. 164, 173, 112 S.Ct. 541, 547, 116 L.Ed.2d 526 (1991), and by "pierc[ing] the veil of administrative secrecy and [ ] open[ing] agency action to the light of public scrutiny." *Id.*, at 173, 112 S.Ct. at 547 (quoting *Department of Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11 (1976)); *see also McCutchen v. Department of Health and Human Servs.*, 30 F.3d 183, 184 (D.C.Cir. 1994).

 Nonetheless, FOIA does not provide unfettered access to government files and papers. *McCutchen*, 30 F.3d at 184. Nine categories of documents are exempt from disclosure. 5 U.S.C. § 552(a)(2), (b); *see Reporters Committee*, 489 U.S. at 755, 109 S.Ct. at 1472; *Beck v. Department of Justice*, 997 F.2d 1489, 1490 (D.C.Cir.1993). The agency makes the original determination regarding the applicability of the FOIA exemptions to the particular request, 5 U.S.C. § 552(a)(6)(A), but "the primary interpretative responsibilities rest on the judiciary." *Association of Retired R.R. Workers, Inc. v. United States R.R. Retirement Bd.*, 830 F.2d 331, 334 (D.C.Cir.1987). The agency bears the burden to demonstrate that a claimed exemption applies, 5 U.S.C. § 552(a)(4)(B); *see McCutchen*, 30 F.3d at 185, and courts are to interpret the exemptions narrowly and *de novo*, recognizing that "[d]isclosure, not secrecy, is the dominant objective" of FOIA's statutory scheme. *Rose*, 425 U.S. at 361 & 379, 96 S.Ct. at 1599 & 1607; *see also Reporters Committee*, 489 U.S. at 755, 109 S.Ct. at 1472.

### B. *The Standard of Review.*

 Summary judgment is appropriate in FOIA cases when there is "no genuine issue as to any material fact and … the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Petroleum Info. Corp. v. Department of the Interior*, 976 F.2d 1429, 1433 (D.C.Cir.1992); *Alyeska Pipeline Serv. v. EPA*, 856 F.2d 309, 314 (D.C.Cir.1988). "The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255, 106 S.Ct. at 2513. At the same time, however, Rule 56 places a burden on the nonmoving party to "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to

interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (citation omitted). "When an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption, summary judgment in favor of the FOIA plaintiff is appropriate." *Petroleum Info. Corp.,* 976 F.2d at 1433.

## C. The Motion for Summary Judgment

The Army has moved for summary judgment as to its withholding of portions of 26 records.[3] Of those records, the defendant has invoked Exemptions 5 (deliberative process),[4] 6 (personal privacy) and 7(C) (law enforcement records) to justify nondisclosure for each record, save two. For those two records, the Army has claimed only Exemption 6 for Document No. 3 (the McCarty Investigation Report), and it only claims Exemptions 5 and 6 as to Document No. 78 (Lt. Col. Redfield memorandum dated Nov. 17, 1992).[5] After briefly outlining the general principles of law applicable to the exemptions claimed, those principles are applied to each document withheld.

### 1. Exemption 5—Deliberative Process

■ Exemption 5 of FOIA protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party ... in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption encompasses all documents that are shielded from civil discovery, including those that are protected by the "deliberative process" privilege. *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 149, 95 S.Ct. 1504, 1516, 44 L.Ed.2d 29 (1975); *Petroleum Info. Corp.,* 976 F.2d at 1433. Its purpose is

to shelter "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB,* 421 U.S. at 150, 95 S.Ct. at 1516 (internal quotation and citation omitted).

■ Like all FOIA exemptions, this exemption must be construed as narrowly as is consistent with the efficient operation of the agency. *Mapother v. Department of Justice,* 3 F.3d 1533, 1537 (D.C.Cir.1993); *Army Times Publishing Co. v. Department of Air Force,* 998 F.2d 1067, 1069 (D.C.Cir.1993). The deliberative process privilege, therefore, protects only those documents that are both predecisional and deliberative. *EPA v. Mink,* 410 U.S. 73, 88, 93 S.Ct. 827, 836, 35 L.Ed.2d 119 (1973). To determine whether a document is predecisional, a court must examine whether it was prepared " 'to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made." *Petroleum Info. Corp.,* 976 F.2d at 1434 (quoting *Renegotiation Bd. v. Grumman Aircraft Engineering Corp.,* 421 U.S. 168, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975)). The material sought must be "antecedent to the adoption of an agency policy." *Jordan v. Department of Justice,* 591 F.2d 753, 774 (D.C.Cir.1978). An agency is not obligated to demonstrate a specific final decision, but must only establish "what deliberative process is involved and the role played by the documents in the course of that process." *Coastal States Gas Corp. v. Department of Energy,* 617 F.2d 854, 868 (D.C.Cir. 1980). The agency must provide sufficient information about its decisionmaking process to establish that the document withheld was actually a part of that process. *Senate of Puerto Rico on Behalf of Judiciary Committee v. Department of Justice,* 823 F.2d 574,

---

3. 30 records, or portions thereof, were originally withheld and 54 records were disclosed. After it moved for summary judgment, the Army withdrew its claims of exemption for four records and stated that it would provide copies of those records to the plaintiff. *See* Reply at 8.

4. For Document No. 12, the Army has staked its claim on both the deliberative process and the attorney-client privilege prongs of Exemption 5.

5. Initially, the Army had also invoked Exemption 5 for Document No. 3 (the McCarty Investigation Report), *see Vaughn* Index at 1, but later withdrew that claim. *See* Reply at 8. Also in its Reply, the defendant withdrew its claim that the deliberative process exemption protected documents 46 through 48 and 66 (letters and a statement by W. Shepherd Smith, Jr., President of ASAP and a non-employee of the Department of Defense). *Id.*

**34**

586 (D.C.Cir.1987); *Bristol–Meyers Co. v. FTC*, 598 F.2d 18, 28 n. 20 (D.C.Cir.1978). Merely claiming that a record was part of its decisionmaking process is not enough. *Safe-Card Serv. v. SEC*, 926 F.2d 1197, 1204 (D.C.Cir.1991); *see Coastal States Gas Corp.*, 617 F.2d at 868.

■ While not always determinative, the deliberative nature of a document is frequently determined through the "simple test that factual material must be disclosed but advice and recommendations may be withheld." *Wolfe v. Department of Health and Human Services*, 839 F.2d 768, 774 (D.C.Cir. 1988) (en banc). This fact/opinion distinction cannot be applied mechanically because Exemption 5 protects from disclosure predecisional materials, even though factual, if disclosure of that material would "reveal an agency's or official's mode of formulating or exercising policy-implicating judgment." *Petroleum Info. Corp.*, 976 F.2d at 1435.

■ The agency is required to make a "segregability" determination, *see* 5 U.S.C. § 552(b), stating that "all reasonably segregable" non-exempt (i.e, factual) information has been disclosed to a requester unless the "non-exempt portions of a document … are inextricably intertwined with exempt portions." *Krikorian v. Department of State*, 984 F.2d 461, 466 (D.C.Cir.1993); *see also Church of Scientology v. Department of Justice*, 30 F.3d 224, 229 (1st Cir.1994); *Army Times Publishing Co.*, 998 F.2d at 1068; *PHE, Inc. v. Department of Justice*, 983 F.2d 248, 252 (D.C.Cir.1993).

■ The fundamental purpose of Exemption 5 is to protect the agency's decisionmaking process. Thus, while opinions and recommendations contained in a memorandum or other document are protected, "a report does not become part of the deliberative process merely because it contains only those facts which the person making the report thinks material. If this were not so, every factual report would be protected as part of the deliberative process." *Playboy Enterpr. v. Department of Justice*, 677 F.2d 931, 935 (D.C.Cir.1982). Similarly, material is not protected merely because the choice of facts reflects the declarant's viewpoint. *See, e.g.,*

*Wayland v. NLRB*, 627 F.Supp. 1473, 1476–77 (M.D.Tenn.1986).

■ statements obtained in the course of an agency investigation are subject to withholding under FOIA's Exemption 5, provided such statements otherwise satisfy the criteria of Exemption 5. *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 798, 104 S.Ct. 1488, 1492, 79 L.Ed.2d 814 (1984) (statements of Air Force witnesses "are unquestionably 'intra-agency memorandums or letters' "); *Badhwar v. Department of the Air Force*, 829 F.2d 182, 184 (D.C.Cir.1987). However, absent a promise of confidentiality or some other privilege, facts contained in statements by agency witnesses are subject to disclosure. *See Weber Aircraft*, 465 U.S. at 799, 104 S.Ct. at 1492 (approving application of the privilege set forth in *Machin v. Zuckert*, 316 F.2d 336 (D.C.Cir.), *cert. denied*, 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 124 (1963), under Exemption 5 of FOIA); *Badhwar*, 829 F.2d at 184–85 (deciding between disclosure and nondisclosure turns upon whether material is obtained based on a promise of confidentiality or "otherwise reflects 'deliberations or recommendations as to policies that should be pursued.' ") (quoting *Machin*, 316 F.2d at 339); *Martin v. Office of Special Counsel, MSPB*, 819 F.2d 1181, 1186 (D.C.Cir.1987) (facts protected as "work product"); *Wayland*, 627 F.Supp. at 1476–77 (M.D.Tenn.1986) ("witness statements [are not] inextricably intertwined with deliberative material merely because the choice of facts reported or questions asked necessarily reveal the reporter's viewpoint").

■ Witness statements, like those withheld by the Army here, raise Exemption 5 questions where the witnesses include among their version of the facts their opinions and recommendations. Unless the factual portions cannot be reasonably segregated from the opinions or where disclosure would otherwise reveal the agency's deliberative process, the facts must be disclosed under FOIA. *EPA v. Mink*, 410 U.S. at 87–89, 93 S.Ct. at 837; *National Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1118 (9th Cir.1988); *Wolfe*, 839 F.2d at 774; *Weber Aircraft Corp. v. United States*, 688 F.2d 638, 645 (9th Cir.1982), *rev'd on other grounds*,

465 U.S. 792, 798, 104 S.Ct. 1488, 1492, 79 L.Ed.2d 814 (1984); *Montrose Chemical Corp. v. Train,* 491 F.2d 63, 71 (D.C.Cir. 1974); *see Providence Journal Co. v. Department of the Army,* 981 F.2d 552, 568–69 (1st Cir.1992). Of course, the agency still carries the burden to demonstrate that the opinion or recommendation played a definite role in the agency's deliberations, *Coastal States,* 617 F.2d at 868, because the deliberative process is inapplicable to material that could not reasonably be said to reveal the agency's policymaking judgment. *Petroleum Info. Corp.,* 976 F.2d at 1429.

### 2. Exemption 6—personal privacy

 Exemption 6 permits the withholding of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of privacy." 5 U.S.C. § 552(b)(6). The primary purpose of Exemption 6 is to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information. *Department of State v. Washington ·Post Co.,* 456 U.S. 595, 599, 102 S.Ct. 1957, 1960, 72 L.Ed.2d 358 (1982). Exemption 6 does not, of course, protect against every intrusion of a person's privacy—only those that are "clearly unwarranted." *Rose,* 425 U.S. at 382, 96 S.Ct. at 1608–09.

 To fall within the scope of the protection of Exemption 6, the records sought "must first satisfy the threshold requirement of being a 'similar file.'" *New York Times Co. v. NASA,* 920 F.2d 1002, 1004 (D.C.Cir.1990) (en banc). This threshold is minimal and includes information that "applies to a particular individual." *Washington Post Co.,* 456 U.S. at 602, 102 S.Ct. at 1961; *see New York Times Co. v. NASA,* 920 F.2d at 1006. The Supreme Court has consistently rejected a narrow interpretation of this provision. *Washington Post Co.,* 456 U.S. at 600, 102 S.Ct. at 1960–61. Purely personal details pertaining to government employees, such as personal addresses, *e.g., Federal Labor Relations Authority v. Dep't of the Treasury Fin. Mgt. Serv.,* 884 F.2d 1446, 1453 (D.C.Cir.1989), *cert. denied,* 493 U.S. 1055, 110 S.Ct. 863, 864, 107 L.Ed.2d 947 (1990); *National Assoc. of Retired Federal Employees v. Horner,* 879 F.2d 873, 879 (D.C.Cir.1989), *cert. denied,* 494 U.S. 1078, 110 S.Ct. 1805, 108 L.Ed.2d 936 (1990), evaluation reports, *e.g., Ripskis v. Department of Housing and Urban Development,* 746 F.2d 1, 3–4 (D.C.Cir.1984), and employment applications, *e.g., Core v. United States Postal Serv.,* 730 F.2d 946, 948 (4th Cir.1984), fall within the scope of the files protected under Exemption 6.

 Once it is determined that the information sought is of a type that is subject to protection under Exemption 6, determining whether that information is, in fact, exempt from disclosure requires a balancing of the harm to the individual whose privacy would be breached against the public interest served by disclosure. *See Rose,* 425 U.S. at 372, 96 S.Ct. at 1604. Through Exemption 6, "Congress sought to construct an exemption that would require a balancing of the individual's right of privacy against the preservation of the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny.' The device adopted to achieve that balance was the limited exemption, where privacy was threatened, for 'clearly unwarranted' invasions of personal privacy." *Id.,* at 372, 96 S.Ct. at 1604 (citations omitted). As with FOIA generally, the fundamental question in evaluating the public interest is whether disclosure would provide a view of the agency's activities, thereby revealing what our "government is up to." *Reporters Committee,* 489 U.S. at 773, 109 S.Ct. at 1481.

### 3. Exemption 7(C)—law enforcement records

 Exemption 7(C) allows an agency to withhold from disclosure information compiled for law enforcement purposes that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C); *see, e.g., Reporters Committee,* 489 U.S. at 749, 109 S.Ct. at 1468; *Nation Magazine v. United States Customs Serv.,* 71 F.3d 885, 893 (D.C.Cir. 1995). Material is exempt under Exemption 7(C) if "the privacy interest at stake outweighs the public's interest in disclosure."

*Nation Magazine*, 71 F.3d at 893 (citing *Reporters Committee*, 489 U.S. at 776, 109 S.Ct. at 1483); *Davis v. Department of Justice*, 968 F.2d 1276, 1281 (D.C.Cir.1992). A record is exempt from disclosure not merely because it pertains to an individual but because, after balancing the interests, it is determined that disclosure would result in an unwarranted invasion of personal privacy. *Nation Magazine*, 71 F.3d at 893–95. Law enforcement records pertaining to a specific individual may "be cloaked with the public interest if the information would shed light on agency action." *Quinon v. FBI*, 86 F.3d 1222, 1231 (D.C.Cir.1996) (quoting *Nation Magazine*, 71 F.3d at 895).

■ In contrast to the standard applicable to Exemption 6, the threshold for withholding under Exemption 7(C) is lower. A record, or segregable information contained therein, is protected from disclosure under Exemption 7(C) if it "could reasonably" be expected to constitute an "unwarranted" intrusion. On the other, under Exemption 6 withholding is permitted only if the intrusion "would be clearly unwarranted." *Reporters Committee*, 489 U.S. at 756, 109 S.Ct. at 1473.

■ To be subject to the protections of Exemption 7(C), the material must have been "compiled for law enforcement purposes." The general internal monitoring by an agency of its own employees is not shielded from public scrutiny under Exemption 7, because "protection of all such internal monitoring under Exemption 7 would devastate FOIA." *Stern v. Federal Bureau of Investigation*, 737 F.2d 84, 89 (D.C.Cir.1984). An agency investigation is considered to be for law enforcement purposes if it "focuses 'directly on specifically alleged illegal acts, illegal actions of particular identified officials, acts which could, if proved, result in civil or criminal sanctions.'" *Id.* (quoting *Rural Housing Alliance v. Department of Agriculture*, 498 F.2d 73, 81 (D.C.Cir.1974), *r'hg denied*, 502 F.2d 1179 (1974)).

■ The AR 15–6 informal investigations at issue here focused directly on the conduct of Lt.Col. Redfield and other government employees. Upon conducting an investiga-

tion and finding a violation of law or regulation, the Army has the option of conducting disciplinary proceedings against active duty military personnel under Title 10, United States Code, including Article 15 (Non–Judicial Punishment) of the Uniform Code of Military Justice, 10 U.S.C. § 815. For both its civilian employees and military members, the Army could pursue administrative action for the violation of Army regulations. *See, e.g.,* DA 600–50 (conflict of interest regulations).

Because the Army has made a colorable claim of a rational law enforcement purpose in connection with both the Dangerfield and McCarty investigations, the Court finds that the records at issue here, the McCarty Investigation Report and certain enclosures thereto (or portions thereof) were compiled for law enforcement purposes. *Keys v. Department of Justice*, 830 F.2d 337, 343 (D.C.Cir.1987); *see Pratt v. Webster*, 673 F.2d 408, 421 (D.C.Cir.1982) (which established the test in this Circuit prior to removal of the "investigatory" threshold requirement in the 1986 FOIA amendments).

**D. Identifying the relevant interests.**

■■ Although the standard applicable to Exemption 7(C) is different than that applied under Exemption 6, the same balancing formula applies in comparing the public interest with the privacy interest at stake. Of course, the privacy interests cognizable under Exemption 6 are also cognizable under Exemption 7(C). *Stern*, 737 F.2d at 91. Under both Exemptions 6 and 7(C), the Court has a responsibility to identify the relevant interests and then balance them.

■ 1. *The privacy interests.* The first step is to examine the privacy interests implicated by disclosure to third parties of material contained in investigatory files under Exemption 7(C), *see Nation Magazine*, 71 F.3d at 894; *Dunkelberger v. Department of Justice*, 906 F.2d 779, 781 (D.C.Cir.1990), or which is contained in personnel, medical or similar files under Exemption 6. An individual has a privacy interest in the fact that he or she was the subject or target of a government investigation. *See, e.g., Nation Magazine*, 71 F.3d at 894; *Dunkelberger*, 906

F.2d at 781; *Stern,* 737 F.2d at 91; *Fund for Constitutional Gov't v. National Archives & Records Serv.,* 656 F.2d 856, 864 (D.C.Cir. 1981). While a federal employee does not surrender his or her privacy by accepting federal employment, *see Bast v. Department of Justice,* 665 F.2d 1251, 1255 (D.C.Cir. 1981), the employee's privacy interest is diminished where that employee has been investigated for criminal misfeasance relating to the performance of his or her official duties. *Providence Journal v. Department of the Army,* 981 F.2d at 568; *see Stern,* 737 F.2d at 94. *Cf. Carter v. Department of Commerce,* 830 F.2d 388, 390–91 (D.C.Cir. 1987) (distinguishing Stern in holding that private individuals whose names appear in connection with Patent and Trademark Office disciplinary proceedings have a substantial privacy interest in having their identifies withheld).

Individuals whose names appear in agency investigative records also have a privacy interest, because "the mere mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation." *Fitzgibbon v. CIA,* 911 F.2d 755, 767 (D.C.Cir.1990); *see also Dunkelberger,* 906 F.2d at 781; *King v. Department of Justice,* 830 F.2d 210, 233 (D.C.Cir.1987). This Circuit recognizes a categorical exclusion for information withheld under Exemption 7(C) if disclosure could reasonably identify a private individual whose name appears in government files "unless there is compelling evidence that the agency denying the FOIA request is engaged in illegal activity, and access to the names of private individuals appearing in the agency's law enforcement files is necessary in order to confirm or refute that evidence." *SafeCard Serv.,* 926 F.2d at 1205–06. Provided that a redaction serves a useful purpose to protect an individual's privacy, *see Nation Magazine,* 71 F.3d at 896, the name and identifying information of a private individuals can be redacted. If the redaction reasonably protects the privacy interest, the record should be released. *See Reporters Committee,* 489 U.S. at 768–69, 109 S.Ct. at 1479–80; *Rose,* 425 U.S. at 379, 96 S.Ct. at 1608; *Nation Magazine,* 71 F.3d at 896.

*2. The public interest.* The next step is to evaluate the public interest at stake which, under *Reporters Committee,* is limited to FOIA's core purpose to "shed light on an agency's performance of its statutory duties." 489 U.S. at 773, 109 S.Ct at 1482. Disclosure of the information related to "an agency investigation serves the public interest to the extent that it sheds light on the agency's performance of its official duties." *Providence Journal v. Department of the Army,* 981 F.2d at 568; *see also New England Apple Council v. Donovan,* 725 F.2d 139, 144 (1st Cir.1984) ("The public has a significant, enduring interest in remaining informed about actions taken by public officials in the course of their official duties."); *Carter,* 830 F.2d at 390 n. 8 ("The public does have an interest in the proper functioning of [agency] investigations. . . ."). Moreover, the higher the rank and the more prominent the position of the official accused of wrongdoing, the greater the public interest in disclosure. *Providence Journal v. Department of the Army,* 981 F.2d at 568–69; *Stern,* 737 F.2d at 92–94; *see also Beck,* 997 F.2d at 1493 (disclosure of information regarding low-level wrongdoers reveals little or nothing about an agency's conduct); *Carter,* 830 F.2d at 390 n. 8 (acknowledging strong public interest in the disclosure of information related to the performance of public officials acting in their official capacities). "There may be a greater public interest in disclosure where the allegation [of wrongdoing]—although determined unsubstantiated by the agency-may nevertheless be true." *Providence Journal v. Department of the Army,* 981 F.2d at 569. The public interest also extends to knowing whether an investigation was comprehensive and that the agency imposed adequate disciplinary measures. *Dunkelberger,* 906 F.2d at 781. Any claim of a public interest must be "based on known facts." *Beck,* 997 F.2d at 1494.

### E. The documents withheld.

#### 1. *Document No. 3*

Document No. 3 is the McCarty Report, a 13–page document, D Form 1574, which is continued on an attachment and is

entitled "Report of Proceedings By Investigating Officer/Board of Officers." *See Vaughn* Index at 1. The Army has partially released this document, redacting only Finding # 4 and Recommendations # 2, # 3, # 5 and # 6 on the DA 1574 and, on the attachment, redacting only Finding # 4.B, Facts # 7.A.2, # 7.A.3, # 7.A.6 (in major part), # 7.A.7, and Findings # 7.B.1 (in part), # 7.B.2 (in part), and # 7.B.3 through # 7.B.5 (in whole). The McCarty Report was approved *without* exceptions, amendments or substitutions by the approving official, Major General Travis.

To satisfy its burden of proving that nondisclosure is justified under FOIA, the Army offers the following:

> The withheld portion is pre-decisional in nature in that it provides recommendations for action to the deciding official, including findings of violations of Army regulations concerning standards of conduct and associations with private organizations, expresses personal opinions of the investigating officer, and release of the information would constitute a clearly unwarranted invasion of personal privacy. *Vaughn* Index at 1.

In its reply, the Army withdrew its reliance upon Exemption 5; therefore, the only remaining exemption is Exemption 6.[6] *See* Reply at 8. While offering no argument that is specific to Document No. 3, other than the conclusory statement in its *Vaughn* Index, the Army contends generally that:

**6.** Unlike the majority of the documents it has withheld, the Army has not relied upon Exemption 7(C) (law enforcement records) to justify withholding Document No. 3.

**7.** The only "explanation above" in the Motion for Summary Judgment that is specific to Document No. 3 is factual in nature, stating:

> [Col. McCarty's] factual findings were a compilation and summarization of the voluminous information obtained during the investigation and include numerous references to individuals working in the Retrovirology Division. COL McCarty made specific findings regarding whether any personnel assigned to the U.S. Army Medical Research and Development Command acted in violation of U.S. law or Army regulation. After review of the investigation, MG Travis approved all of COL McCarty's findings and recommendations.

Motion for Summary Judgment at 4.

The individuals at issue obviously have a privacy interest in having the information [withheld]. As explained above,[7] the information includes statements concerning assessment of individuals' behavior, competence and personal relationships. Indeed, the statements at issue are in many respects even more sensitive than an employee's performance appraisal.

Motion for Summary Judgment at 8.

The plaintiffs do not challenge, nor could they, that the information sought in Document No. 3 is of a type that is subject to protection under Exemption 6. The Court's role, therefore, is to balance the harm to the individual whose privacy would be breached against the public interest served by disclosure. *See Rose,* 425 U.S. at 372, 96 S.Ct. at 1604. Where privacy is threatened due to *clearly unwarranted* invasions of personal privacy, the record sought may be withheld. *Id,* at 372, 96 S.Ct. at 1604.

In assessing the privacy interest(s) at stake in the redacted portions of this record, it is important to make clear what is at issue in Document No. 3 and what is not. First, unlike *Stern,* 737 F.2d 84 (D.C.Cir.1984), and *Carter,* 830 F.2d 388 (D.C.Cir.1987), the Army has made almost no redactions to protect the *identity* of anyone associated with the investigation. This is most clear with respect to Document No. 3, since the unredacted portions of this document, as well as in other unredacted documents (or portions of other redacted documents), witness identifies are freely disclosed. *See* Document No.

Although unclear, it may be that the Army is relying upon the following general discussion in its argument regarding Exemption 5, which is inapplicable to Document No. 3:

> Second, the withheld documents are deliberative. As described above and exhibit 1, the witness statements and interviews reflect the witnesses' analysis and assessment of the circumstances surrounding a sensitive research program at the Army. The statements and memoranda necessarily reflect the witness' assessment as to what incidents were noteworthy for the purposes of the investigation. In addition, the statements and memoranda reflect numerous opinions of the witnesses of the credibility, behavior, competence and roles of other individuals involved in the program.

*Id.* at 6–7.

3, Index of Exhibits (unredacted listing of individuals who provided statements). Second, other than its generalized arguments, the Army has not made clear *whose* privacy interests are at stake or how disclosure would constitute an *"unwarranted* intrusion" upon those privacy interests. By failing to specifically identify these interests or the potential impact resulting from disclosure, the Army has, of course, undermined its reliance upon the personal privacy exemption.

Turning to Document No. 3, it is evident that while minimal, certain privacy interests would be implicated through the release of the redacted material therein. Lt.Col. Redfield and other targets of the investigation have, of course, "at least a minimal interest in not having it known whether [the McCarty Report] contain[s] or do[es] not contain a letter of reprimand." *Dunkelberger,* 906 F.2d at 782. They also have a minimal interest in whether the McCarty Investigation Report contains a recommendation that adverse action should be taken against them. Similarly, a non-target, whether a witness or an individual whose name merely appears in the record, has a privacy interest in both not being associated with an investigation and in the substance of redacted material where disclosure of that material could reasonably lead to embarrassment, harm or retaliation. *See McCutchen,* 30 F.3d at 189 (Exemption 7(C)).

While Lt.Col. Redfield's privacy interests implicated in Document No. 3 are generally minimal, the public interest at stake is substantial. The record makes clear that the gp 160 vaccine testing conducted at WRAIR, for which the Army received an appropriation of $20,000,000 of taxpayer funds, was indeed a public issue. Lt.Col. Redfield testified at least twice before the United States Con-

gress, and Senator Nunn's introduction left no doubt that the vaccine testing at Walter Reed Army Medical Center involved issues well beyond what the Army describes as mere "interpersonal relationships and personal conflicts" in the Retrovirology Division at WRAIR.[8] The public interest reflected in the plaintiffs' request is not one of mere curiosity regarding internal matters of no public consequence. The public interest, outlined by the plaintiffs based on known facts, involves the core purpose of FOIA: shedding light on how the Army conducted its AID testing, what actions it took in response to allegations of scientific misconduct and improper associations with a non-governmental organization, and its ability to investigate itself in a matter of high public profile—including the role of mid-to-high level agency personnel who promoted an AIDS vaccine before Congress and at international meetings; alleged misrepresentations and scientific misconduct regarding the results of that gp160 testing; the channeling of taxpayer funds to a particular form of AIDS research at the exclusion of other types; and the relationship between Army personnel and a private organization that was given special access to government information and personnel.

Upon reviewing Document No. 3 and considering the Army's stated justification for the redactions therein, the balance generally tilts towards disclosure. Given the substantial public interest at stake, the intrusions, if any, on Lt.Col. Redfield's privacy interests are warranted.[9] Redfield is not a low-level government employee who was "inadvertently" caught up in a public health controversy. *See Stern,* 737 F.2d at 87. Appearing in his capacity as a mid-to-high level officer in the United States Army and as a military medical researcher and Chief of WRAIR's De-

**8.** Upon introducing the $20M amendment to the 1993 Defense Department Authorization Act, Sen. Nunn, relying upon statements by "Army medical experts [who stated] that phase 2 has shown that the vaccine should go to phase 3 as soon as possible," said: "Mr. President, in the case of this kind of research, time literally means saving the lives of people now sick with this deadly disease. The sooner we get these tests completed, the better off so many people in our Nation will be." *See. supra* at pp. ————

(quoting 138 Cong.Rec. § 14156, 15159–60 (Sept. 18, 1992)).

**9.** While it is far from clear that all of the redactions would implicate any cognizable privacy interests of anyone identified in connection with the investigation, *see, e.g.,* Findings # 7.A.3, # 7.A.6 and # 7.A. 7, even accepting *arguendo* that some privacy interest is implicated, any intrusion would nevertheless be warranted.

partment of Retroviral Research, Lt. Col. Redfield made specific representations, on the record, to the United States Congress. His representation appears to have played a significant role in at least Senator Nunn's decision to introduce the amendment appropriating an additional $20,000,000 in taxpayer dollars to the United States Army for gp160–related research. Redfield also made numerous public statements—including one before an international body—regarding the research and testing of gp160 at Walter Reed Army Medical Center.

The public has, therefore, a well-documented, legitimate, and extensive interest regarding the inquiries into Redfield's taxpayer-funded gp 160 vaccine research at WRAIR, as well as into the results of the Army's inquiries into the relationship between WRAIR personnel and a non-government organization that lobbied Congress for gp160 funding. This legitimate and compelling public interest into the Army's actions clearly outweighs the minimal privacy interests, if any, in concealing the substance of a small portion of the factual findings in the McCarty investigation or regarding Col. McCarty's recommendations, *which were approved without change, amendment or modification by MG Travis.* Moreover, not only is Redfield's privacy interest diminished by the Army's selective disclosures, thereby associating him (and others) in major respects with the Dangerfield and McCarty investigations, but the Army has failed to justify with sufficient specificity those redactions that it decided to make. As set out below, the motion will be denied in part.

▮ While any intrusions on Lt.Col. Redfield's privacy are warranted, the same cannot be said for the other target(s) of the investigation who played a lesser role in the gp 160 testing, in the testimony before Congress, in the presentations at inter-service, medical research and international meetings, and in connection with ASAP. Even if the other person(s) was (were) sufficiently high-ranking to justify disclosure of the relevant personnel recommendations, if any, redaction of the identity(ies) would not adequately protect the privacy of that (those) individual(s). Consequently, disclosure of even redacted

material would result in a clearly unwarranted intrusion under Exemption 6. Thus, as set out below, the motion will be granted in part.

▮ Finally, although the Army has offered the Court no great assistance in this regard, it does appear that the privacy interests of Dr. Lucey, Dr. Vahey, Col. Boswell, Col. Burke and Mr. Shepherd Smith could be implicated by disclosure of the information contained in paragraphs 7.A.2, 7.A.3, 7.A.6 and 7.A.7. As previously noted, the Army has almost completely refrained from protecting the identity of any persons associated with the investigation and has freely disclosed the names of witnesses to the investigation. The Army's decision to disclose these identities is, of course, not dispositive as to whether specific redactions should be disclosed, because such material could nevertheless warrant protection under an applicable exemption. Nevertheless, it is relevant when evaluating individual privacy interests at stake.

Upon reviewing the information contained in these paragraphs, it is clear to the Court that the intrusion, if any, upon the remaining personal privacy interests that might result from disclosure of the balance of Document No. 3 would be, at most, *de minimis.* The information here is generally factual. Even where Col. McCarty has characterized his facts as witnesses's opinions, those opinions do not concern sensitive or personal matters. While disclosure would be unlikely to lead to harm, embarrassment or retaliation, the material does pertain to matters of substantial public interest: the relationship between WRAIR personnel involved in the gp 160 vaccine study and ASAP. Except as noted previously, the balance tilts heavily towards disclosure.

Accordingly, the motion for summary judgment will be denied in part and granted in part as to Document No. 3. Disclosure will be ordered as to the following redactions:

1. DA 1574, Section IV, Findings, ¶ 4, first sentence;

2. DA 1574, Section V, Recommendations, ¶ 2;

3. DA 1574, Section V, Recommendations, ¶ 5 except for the last clause of the first

sentence beginning with the word "and" and ending with the word "regulations;"

4. DA 1574, Section V, Recommendations, ¶ 6;

5. Attachment to DA 1574, ¶ 4.B.1, Findings;

6. Attachment to DA 1574, ¶ 7.A.2 through and including ¶ 7.A.3, Facts;

7. Attachment to DA 1574, ¶ 7.A.6 through and including ¶ 7.A.7, Facts;

8. Attachment to DA 1574, ¶ 7B.1 (last sentence); and

9. Attachment to DA 1574, ¶ 7B.2 through 7.B.5.[10]

And, the motion for summary judgment will be granted as to the following redactions, which may continue to be withheld under Exemption 6:

1. DA 1574, Section IV, Findings, ¶ 4, second sentence;

2. DA 1574, Section V, Recommendations, ¶ 3; and

3. Attachment to DA 1574, ¶ 4.B.2, Findings.

### 2. Document No. 12.

■■■ This record is a "Memorandum for Record," dated April 2, 1993, which reflects a telephone conversation between Col. McCarty and Dr. Daniel Lucey, a witness to the informal investigation whose identity the Army has previously disclosed. The record itself has been fully disclosed except for six sentences.

In claiming Exemptions 5, 6 and 7(C), the Army offers the following:

**10.** In the *in camera* submission of what should have been wholly "unredacted" copies of the Army's withholding, the beginning of the second sentence in paragraph 7.B.2 was redacted. While this omission was likely an error, in light of the surrounding material which the Court has ordered disclosed, the Army has not met its burden to demonstrate that missing words fall within Exemption 6. This paragraph shall therefore be disclosed to the plaintiffs in its entirety.

**11.** The mere fact that a military lawyer responds to a question from a military officer conducting an informal investigation does not enshrine that conversation or the accompanying factual discussions with the broad and important protections offered by the attorney-client privilege. *See Brinton v. Department of State*, 636 F.2d 600, 604

Document pertains to conduct of investigation and personal information obtained from telephone conversation. The withheld portion discusses provides (sic) personal information, expresses personal opinions, and contains attorney-client privileged material. Disclosure of these portions could have a chilling effect on open agency communications, as well as constitute an unreasonable and unwarranted invasion of privacy.

*Vaughn* Index at 3–4.

Upon reviewing the redacted material *in camera*, the motion for summary judgment will be granted as to Document No. 12, because the redacted material offers plaintiffs nothing probative of "what the Army was up to" in the vaccine testing, in its relationship with ASAP or when it conducted its informal investigation.

■■■ Having said that, the Court notes that the Army's claim of Exemption 5 protection under the attorney-client privilege is simply bizarre.[11] And, contrary to the Army's boilerplate, the Court cannot find "any" personal opinions in the redacted material to justify invoking the deliberative process privilege. Nor has the Army explained the role, if any, that this redacted material played in its deliberations, *see SafeCard Serv.*, 926 F.2d at 1204, or how disclosure would "chill" open and frank discussion within the Department of Defense when those who are most likely to retaliate against Dr. Lucey already have the information. *See Army Times*, 998 F.2d at 1070–71.

(D.C.Cir.1980); *Mead Data Central v. Department of the Air Force*, 566 F.2d 242, 254 (D.C.Cir. 1977). While claiming attorney-client privilege, the Army has offered nothing to indicate that the conversation here was intended to be a confidential communication in order to obtain legal advice. *See Tax Analysts v. Internal Revenue Serv.*, 117 F.3d 607, 618 (D.C.Cir.1997). In fact, both the subject and context of the brief conversation make clear that it was not. For a general discussion of the applicability of this privilege and its limits, see Edna Selan Epstein, The Attorney–Client Privilege and the Work–Product Doctrine (3rd ed.1997). The Army's naked claim of attorney-client privilege in the *Vaughn* Index, a claim which is unsupported in law and in fact, makes clear why this Court ordered *in camera* review.

While Dr. Lucey may have, at most, a minimal privacy interest in the redacted conversation, the bottom line is that this redaction falls well outside the core purpose of FOIA: it sheds absolutely no light on the operation of a government agency. The information in the redacted material was compiled for law enforcement purposes making Exemption 7(C) applicable. After balancing Dr. Lucey's *de minimis* privacy interest with nothing of public interest, the redaction will be upheld under Exemption 7(C).[12] *See Beck,* 997 F.2d at 1494 ("something outweighs nothing" every time).

### 3. Document No. 13.

 This record is a Memorandum for Record reflecting Col. McCarty's interview of ASAP's Shepherd Smith on April 6, 1993. The record has been released except for two sentences for which the Army relies upon Exemptions 5, 6, and 7(C).[13] While it is doubtful that the redaction would be upheld based upon the claim under the "deliberative process" exemption, the Court need not reach that issue because the redaction is appropriate under both Exemptions 6 and 7(C). The redacted material sheds *de minimis* light, if any at all, on the operation of the Army or its relationship to ASAP. On the other hand, disclosure would subject the witness to embarrassment. Given this balancing, disclosure would be a clearly unwarranted intrusion on Smith's personal privacy. The motion for summary judgment will be granted as to Document No. 13.

### 4. Document No. 58.

 This record is a statement dated November 17, 1992, by Lt.Col. Redfield to the AR 15–6 investigating officer (who was then Col. Dangerfield). The document has been substantially released, but contains a number of redactions. The Army has attempted to justify those redactions based on Exemptions 5, 6 and 7(C):

> The withheld portion discusses departmental or project management topics, employee relations, statements as to credibility and interpersonal relations, and expresses personal opinions. Disclosure of these portions would have a chilling effect on open agency communication, as well as constitute an unreasonable and unwarranted invasion of privacy.

*Vaughn* Index at 15.

In this witness statement, which provides Redfield's version of the facts, the redactions are a "mixed bag." The Army's redaction of matters relating to the performance and management of personnel in the Department of Retroviral Research will be upheld based on Exemption 6 since disclosure of these redactions would shed little, if any, light on how the agency performed its gp 160 vaccine testing or its other missions. On the other hand, disclosure could reasonably constitute an unwarranted intrusion on the personal privacy of the numerous employees discussed by Lt.Col. Redfield (including a discussion regarding his own performance evaluations). Consequently, the *motion for summary judgment will be granted* regarding the redactions of paragraph 1 on page 1 (in its entirety), paragraph 3 on pages 2–A, and paragraphs 1–3 on page 10 of the statement.

 the other hand, the remainder of the redactions represent Redfield's version of the facts related to the Army's conduct of the gp 160 testing—an issue of compelling public interest. The Army has neither justified its "cherry picking" by providing a specific explanation why these redacted facts warrant protection whereas the disclosed facts did not. And, the Court is unable to discern why disclosure of these facts would result in an intrusion, clearly unwarranted or otherwise, of anyone's privacy any more than would

---

**12.** Because the material is exempt under the lower standard applicable to Exemption 7(C), the Court need not, and does not, balance the relative interests under Exemption 6.

**13.** The *Vaughn* Index provides:
Document relates Mr. Smith's personal information and beliefs. The withheld portion re-

lates to information of a personal nature and expresses personal opinions. Disclosure of these portions could have a chilling effect on open agency communication, as well as constitute an unreasonable and unwarranted invasion of privacy.
*Id.* at 4.

those facts that the Army has previously disclosed. Offering little more than boilerplate as clarification, the Army has not met its burden to withhold the factual material. Nor has it justified its failure to segregate the factual material. Of course, information identifying private citizens, if any, may be redacted under Exemption 7(C). *See Safe-Card Serv.,* 926 F.2d at 1205–06. Accordingly, except for information identifying private citizens, if any, disclosure will be ordered of the previously redacted material on pages 6, 7, 8, 9 and the first four lines of page 10. The motion for summary judgment will therefore be denied in part and granted in part.

### 5. Documents No. 46—48.

Although the Army withheld these documents based upon Exemptions 5 and 6, it withdrew its claim that the material was exempt and has represented to the Court that the documents have been disclosed to the plaintiffs. See Reply at 8.

### 6. Documents No. 59—63, 65 & 67—77 (witness statements).

The witness statements in Documents No. 59 through 63, 65, and 67 through 77

U raise similar issues; they were all withheld on the same general bases (Exemptions 5, 6 and 7); and they will be each dealt with in this category.[14] In each partially redacted statement, the Army has released the identity of the witness declarant but generally redacted large segments of material. The Court's *in camera* review reveals that while certain withholdings are justified, the substantial redaction of the factual material in those statements is not.

The Army has broadly claimed the "deliberative process" exemption for the vast quantities of redacted material in these statements, even though much of the material is factual in nature. Although certain factual material was released in what *may* have been an effort to satisfy its obligation to release factual material that is reasonably segregable, the Army has not satisfactorily explained what makes the material it released different from much of what it has redacted. *See Army Times,* 998 F.2d at 1071–72. Such selective disclosures undermine the Army's claim that the material in the witness statements is worthy of a claim of privilege under Exemption 5. *Id.* at 1071. Contrary to the defendant's argument, selective factual disclosures, which our Court of Appeals has defined as "cherry picking," *see id.* at 1072, may cause more of a "chilling effect" than full disclosure because a witness has no control over which part of his or her statement the agency will, for whatever reason, decide to release. Significantly, the Army has not claimed, nor can this Court find, that the facts are inextricably intertwined with exempt material such that disclosure of the facts would expose the Army's deliberative process.

While the broad claims the Army asserts are unjustified, certain redactions, such as those dealing with personnel performance issues and employee relations are appropriate under Exemption 7(C). *Compare* Document No. 58 at ¶ 2 (redaction of purely factual discussion regarding the gp 160 program) *with id* ¶ 4 (redaction of material dealing primarily, if not exclusively, with employee performance and internal relations). The withholding of certain information in the witness statements, which were compiled in the course of a law enforcement investigation, will be upheld because such information reveals little, if anything at all, regarding the gp 160 vaccine testing or WRAIR's relationship with ASAP; disclosure of this material could reasonably be expected to subject the witness declarant (or another individual) to embarrassment, harm or retaliation. In these limited circumstances, balancing the relevant interests tilts towards withholding under Exemption 7(C).[15] Similarly information that identifies private citizens may be

---

14. While the Army's *Vaughn Index* uses similar language to justify each withholding, the Court recognizes the slight differences regarding each document. Where those differences make a difference in the Court's analysis, they have been taken into account.

15. The Court does not, therefore, reach the applicability of Exemption 6 for this material.

withheld even though the individual's identity might be pieced together independently or as a result of previous disclosures. Other than this, however, as detailed below, the Army has simply not met its burden to justify the massive factual redactions under any the three exemptions upon which it relies.

 Nor does Exemption 7(C) justify withholding when the declarants' privacy interests in having the remainder of the *factual* portions of their statements withheld is balanced with the substantial public interest regarding the Army's gp160 vaccine testing program and/or its relationship with ASAP. Disclosure of the "rest of the story" could not reasonably be expected to cause these witnesses (or other individuals) harm, embarrassment or expose them to the potential for retaliation, and the Army has not carried its burden to demonstrate to the contrary.[16]

Accordingly, as to **Document No. 59** (statement of Lt.Col. Birx), the following previously redacted material shall be disclosed:

1. paragraph 2 on page 1;

2. the first full paragraph on page 2 (which commences with the phrase "On 1 July");

3. commencing with the remainder of the third paragraph on page 2, the material that follows up to and including the second paragraph on page 6;

4. except for the first sentence (which commences with the word "This"), the remainder of the third paragraph on page 6; and

5. commencing with the fourth paragraph on page 6, the material that follows up to and including the fifth full paragraph on page 9, which commences with the word "We."

For the reasons stated above, the following material in Document No. 59 may continue to be withheld under Exemption 7(C):

1. on page 1, paragraphs 1 and 4 (which continues onto page 2);

2. the name of the private individual in paragraph 2 on page 2;

3. the first sentence of the third paragraph on page 6 (which commences with the word "This" and ends with the word "possess");

4. the last paragraph on page 9 (which commences with the word "This.").

As to **Document No. 60** (the statement of Col. Burke), the following previously redacted material shall be disclosed:

1. the first sentence of the first paragraph on page one;

2. the first six sentences of the first fill paragraph on page 4 (the sixth sentence ends with the word "etc.");

3. paragraph 2 on page 4; and

4. except for the first fill paragraph on page 7, the redactions on pages 7–8 shall be disclosed.

For the reasons stated above, the following material in Document No. 60 may continue to be withheld under Exemption 7(C):

1. other than the first sentence, the remainder of the first paragraph on page 1 and the material that follows up to and including the first four lines on page 4;

2 other than the first six sentences of the first full paragraph on page 4, the remainder of the paragraph, commencing with the words "On July 10" and ending with the word "straight;"

3. the third sentence of the second full paragraph on page 6; and

4. the first full paragraph on page 7.

As to **Document No. 61** (statement of Dr. Vahey), the following previously redacted material shall be disclosed:

1. the material on pages 3 and 4, except for the third sentence of the first full paragraph on page 4;

2. the name of the reporter in the first sentence of the first full paragraph on page 5; and

3. the third full paragraph on page 5 in its entirety.

The following material in Document No. 61 may continue to be withheld under Exemption 7(C):

---

16. Were the Court to accept the Army's view that a witness' version of the facts constitutes an "opinion" merely because it is based on the witness's perspective, facts would never be disclosed—a result clearly at odds with FOIA's mandate.

1. the third sentence of the first fill paragraph on page 4; and

2. except for the disclosures ordered above, the material on page 5.

As to **Document No. 62** (the statement of Capt. Mayers), the following previously redacted material shall be disclosed:

1. the material on pages 2 and 3, except for the third sentence of the last paragraph on page 3 (which commences with the word "The" and ending with the word "differences" (on page 4)); and

2. except for the sentence described in ¶ 1 above and the first fill paragraph on page 4 (commencing with the word "COL"), the material on page 4.

For the reasons stated above, the following material in Document No. 62 may continue to be withheld under Exemption 7(C):

1. the material on page 1;

2. the third sentence of the last paragraph on page 3 (which commences with the word "The" and carries over to page 4, ending with the word "differences"); and

3. the first full paragraph on page 4 (which commences with the word "COL" and ends with the word "trial").

As to **Document No. 63** (the statement of Dr. Eddy), the following previously redacted material shall be disclosed:

1. the second full paragraph on page 2 (which commences with the word "To").

For the reasons stated above, the remainder of the material in Document No. 63 may continue to be withheld under Exemption 7(C).

As to **Document No. 65** (the statement of Maj. Michael), the following previously redacted material shall be disclosed:

1. commencing with the material in the first full paragraph on page 3 up to and including the redacted sentence in the first fill paragraph on page 4;

2. the fifth sentence of the third full paragraph on page 4 (which commences with the words, "I described" and ends with word "vaccine");

3. the material in the fourth full paragraph on page 5 continuing over onto page six;

4. the material on page 6, including that which carries over onto page 7; and

5. except for the third sentence (which commences with the word "I" and ends with the word "manner"), the second full paragraph on page 7.

For the reasons stated above, the following material in Document No. 65 may continue to be withheld under Exemption 7(C):

1. the material on pages 1, 2 and the continued paragraph onto page 3;

2. Except for the redaction noted in ¶ 2 above, the material in the third full paragraph on page 4 (which carries over onto page 5 and ends with the word "workshop");

3. The first full paragraph on page 7 (which commences with the word "MAJ" and ends with the words "as well"); and

4. the third sentence of the second full paragraph on page 7.

As to **Document No. 67** (the statement of Dr. William McCarthy), the following previously redacted material shall be disclosed:

1. the last sentence in paragraph 2 on page 1;

2. the material on page 1, commencing with paragraph 3 up to and including the first full paragraph on page 2;

3. the material in the fourth full paragraph on page 2;

4. the material in the first paragraph on page 3;

5. the material in the third paragraph on page 3;

6. the material in the fourth paragraph on page 3, which carries over to page 4;

7. the material in the second full paragraph on page 4, which carries over to page 5; and

8. the material on pages 5 and 6, except for the last paragraph on page 6 which carries over onto page 7.

For the reasons stated above, the following material in Document No. 67 may continue to be withheld under Exemption 7(C):

1. the first two sentences of the first paragraph on page 1;

2. the second paragraph on page 1;

3. the last paragraph on page 6 which carries over onto page 7; and

4. the two paragraphs on page 7.

As to **Document No. 68** (the statement of John Lowe), except for the last sentence of the paragraph 4, the material in paragraph 4 on page 1 shall be disclosed. The remaining portions of Document No. 68 may be withheld under Exemption 7(C) since the remaining material is non-factual and is comprised of opinions regarding performance and personnel management, disclosure of which would shed almost no light on the operation of government and could reasonably result in an unwarranted intrusion of personal privacy.

As to **Document No. 69** (the statement of Dr. Edmund Tramont), the following previously redacted material shall be disclosed:

1. the remaining material in paragraph 3 on page 1;

2. the first, second, sixth and seventh sentences of paragraph 4 on page 1;

3. the first sentence of paragraph 5 on page 1;

4. the first half of the first sentence of the first full paragraph on page 2 up to the words "and repeated;" and

5. the last paragraph on page 2.

The remaining portions of Document No. 69 may be withheld under Exemption 7(C) because disclosure would shed almost no light on the operation of government, but could reasonably cause embarrassment leading to an unwarranted intrusion of personal privacy. This consists of the following:

1. the third, fourth and fifth sentences of paragraph four on page 1

2. the second and third sentences of paragraph 5 on page 1;

3. the sixth paragraph on page 1 which carries over onto page two; and

4. the last half of the sentence in the first full paragraph on page two (commencing with the word "and" and ending with the word "research").

---

17. While the seven-page attachment is not specifically identified, Dr. Ruiz's memorandum, which immediately precedes it, refers to a "Memo of 23 April 92." Other than the boilerplate in the

As to **Document No. 70** (the statement of Dr. John F. Brundage), the material on pages 1 and 2 shall be disclosed. The last paragraph on page 3 may be withheld under Exemption 7(C): disclosure would shed no light on the operation of government but could reasonably cause embarrassment.

As to **Document No. 71** (the statement of Dr. Kenneth Wagner), the following material shall be disclosed:

1. the second full paragraph on page 2 (which commences with the word "I"), except for the last sentence;

2. the third and the fourth paragraphs on page 2 which carries over to page 3;

3. the second full paragraph on page 3 (which commences with "Rumors") up to and including the first full paragraph on page 4 (which commences with the word "I"); and

4. the seven-page attachment of notes involving analysis of gpl60 data which immediately follows Dr. Ruiz's memorandum of June 10, 1992.[17]

The remaining material in this document may be withheld under Exemption 7(C) because it sheds insufficient light upon the gp160 program or the Army's investigation to warrant any intrusion on personal privacy that might result.

As to **Document No. 72** (Statement of Dr. Karney), the redacted material on page 1 shall be disclosed. The single paragraph on page 2 may be withheld under Exemption 7(C); the material sheds no light on the conduct of the agency and, while the privacy interests are, at best, *de minimis,* something outweighs nothing every time.

As to **Document No. 73** (Statement of Dr. Hendrix), the following material shall be disclosed:

1. paragraph 2 on page 1 up to and including the fourth full paragraph on page 9; and

2. the first (full) and second paragraphs on page 10.

---

*Vaughn* Index, the Army has offered no argument specific to why the seven-page attachment should be exempt from disclosure.

The last paragraph on page 9 (which carries over onto page 10) sheds no light on the Army's gp160 vaccine testing program, its relationship to ASAP or its investigation into scientific misconduct, and it may be withheld under Exemption 7(C).

As to **Document No. 74** (Statement of Dr. R. Neal Boswell), the following material shall be disclosed:

1. paragraph 2 on page 1 up to and including paragraph 4 on page 1, which carries over to page 2;

2. the second full paragraph on page 2 up to and including the first sentence of the fourth paragraph on page 2 (which ends with the word "misinterpreted"); and

3. the last paragraph on page 2 which carries over to page 3.

Because the first full paragraph on page 2 and the last two sentences of paragraph 4 on page 2 are of a non-factual nature and shed no light on the Army's gp160 vaccine testing program, its relationship to ASAP or its investigation into scientific misconduct, that material may continue to be withheld under Exemption 7(C).

As to **Document No. 75** (Statement of Dr. Charles Davis), the single sentence that is redacted may be withheld under Exemption 7(C). The material sheds no light on the operation of a government agency, but disclosure could reasonably lead to an unwarranted intrusion upon personal privacy.

As to **Document No. 76** (Statement of Dr. Charles Oster), the following shall be disclosed:

1. the material on page 1, which carries over onto page 2;

2. the first full and second paragraphs on page 2; and

3. the last paragraph on page 2 which carries over to page 3 up to and including the first two sentences in the first fill paragraph on page 3. (The second sentence in the first full paragraph on page 3 begins with "The first" and ends with the words "no change.")

The following material may be withheld under Exemption 7(C):

1. the identities redacted on page 2;

2. the last sentence of paragraph 5 on page 2; and

3. the third sentence in the first full paragraph on page 3 (which commences with the words "The other is") up to and including the fifth paragraph on page 3.

As to **Document No. 77** (Statement of Dr. Daniel Lucey), the following shall be disclosed:

1. the second paragraph on page 6; and

2. the second and third paragraphs on page 7.[18]

Because the following material involves only personnel matters and would shed no light on government operations, it may withheld under Exemption 7(C):

1. the material on page 2 (part of the fourth paragraph); and

2. the material on page 3 (parts of the second and third paragraphs);

**7. Document No. 78 (Redfield memorandum).**

 This document, which contains only four redactions, is a memorandum authored by LTC Redfield providing a chronology of events from April 27, 1992 until November 12, 1992. While the redactions of July 31, 1992, shall be disclosed, the Army may withhold the redactions in the July 15, 1992, entry (regarding a derogatory comment about a peer) and the last entry (regarding Lt.Col. Redfield's "Officer Evaluation Report") under Exemption 6.

---

**18.** On page 8, immediately before the concluding paragraph of Dr. Lucey's statement, there is a large space (of approximately 4–6 lines in width). The implicit representation is that this space did not contain material that has been redacted. However, the Court desires that the Army make explicit what is implicit. Within twenty (20) days of the issuance of this Memorandum Opinion, the Army shall, by praecipe filed with the Clerk, confirm that this space did not contain text that was previously redacted. If the space did contain redacted text from Dr. Lucey's statement, the praecipe shall so state, attach a copy of the redacted text, and provide an explanation as to why such material was not included in the original submission.

**8. Document No. 79 (Redfield OER response).**

 This document is Lt.Col. Redfield's response regarding his Officer Evaluation Report. It may be withheld under both Exemptions 6 and 7(C), since it sheds no light on the operation of the Army and disclosure would constitute a clearly unwarranted invasion of Lt.Col. Redfield's personal privacy.[19]

**9. Documents No. 81—82 (witness interview memoranda).**

**Document No. 81** is a summary of an interview with Col. Burke in a question/answer format. Only three answers (or portions thereof) were redacted. All three redactions shall be disclosed. The answer to question # 25 bears directly upon the conduct of the gp160 vaccine testing and Lt.Col. Redfield's representations. While under other circumstances such disclosure might be an intrusion upon an individual's personal privacy, here such an intrusion is not unwarranted. The redactions in the answers to questions # 28 and # 29 bear directly upon the Army's relationship to ASAP. The public interest is substantial and no *cognizable* privacy interest would be implicated given the broad disclosures already made by the Army in this document.

**Document No. 82** is a similar summary of an interview with Dr. Vahey, whose answers were redacted in questions # 11, # 13, # 14 and # 23. Each answer relates Dr. Vahey's version of the facts and each answer bears directly upon matters of public interest at issue here. As with Document No. 81, any intrusion upon personal privacy is not unwarranted. The redactions shall be disclosed.

 **Document No. 84** is a similar summary of an interview with Dr. Redfield, whose answer to question # 12 was redacted. While the question relates to the relationship between ASAP and WRAIR, the answer is non-responsive and provides no insight into the operation of a government agency. While the privacy interest is weak, at best, it outweighs nothing. The material may be withheld under Exemption 7(C).

**III. Conclusion**

Accordingly, it is hereby

**ORDERED** that the defendant's motion for summary judgment is denied in part and granted in part. The Army shall disclose the material outlined above within 30 days of this Order, filing a copy thereof with the Clerk of Court; it is

**FURTHER ORDERED** that, pursuant to Fed.R Civ.P. 58, partial judgment shall be entered in favor of the defendant and partial judgment shall be entered in favor of the plaintiffs by separate judgment page filed this date;

**FURTHER ORDERED** that the defendant shall file the praecipe described at page 47 n. 18 of this opinion within twenty (20) days of this Order; it is

**FURTHER ORDERED** that the defendant's *in camera* submission shall be filed under seal pending final action in this matter, after which such submission shall be returned sealed to the defendant without further order by this Court; and it is

**FURTHER ORDERED** that in accordance with Local Rule 215, the parties shall meet and confer, and attempt to reach agreement regarding the plaintiffs' request for attorneys' fees and costs. *See* 5 U.S.C. § 552(a)(4)(E); *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983); *Maynard v. CIA*, 986 F.2d 547, 568 (1st Cir.1993); *Weisberg v. Department of Justice*, 745 F.2d 1476, 1495–1500 (D.C.Cir.1984). After such meeting, but on or before **September 15, 1997,** the parties shall file a joint memorandum advising the Court of the status of their discussions and as to any agreements that they have reached or are unable to reach; and it is

**FURTHER ORDERED** that, should the parties be unable to agree, the time within which to file a motion for fees under Fed. R.Civ.P. 54(d)(2)(B) will be extended for thirty (30) additional days until **October 15, 1997;** the defendants' opposition will be due on or before October 29, 1997; the plaintiffs'

---

**19.** The Court does not reach the Army's claim that this material is exempt under Exemption 5.

reply, if any, shall be filed on or before **November 5, 1997.**

IT IS SO ORDERED.